UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA L. MCELGUNN,

                Plaintiff,              Case No. 04-74471

vs.

                                        HONORABLE BERNARD A. FRIEDMAN
                                        CHIEF JUDGE
JO ANNE B. BARNHART,              HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,     MAGISTRATE JUDGE

                Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.**      **BACKGROUND**

Sandra L. McElGunn brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be GRANTED and Defendant's motion for summary judgment be DENIED.

      **A.**      **Procedural History**

This is an action for judicial review of the Commissioner's final decision that Plaintiff not entitled to DIB under the Social Security Act. 42 U.S.C. § 405(g).

In November 2000 Plaintiff applied for DIB, claiming disability since March 28, 1999, due to scoliosis and Behcet's disease (R. 56, 64). Her work history indicates that she last worked in March 1999 (R. 73), the ALJ notes her last date insured is June 30, 1999 (R. 21). Her earnings record is too faint to verify this (R. 59-62). Plaintiff's claim was denied upon initial review. An

administrative hearing was held on February 14, 2002, at which Plaintiff testified and was represented by an attorney (R. 236). On April 18, 2002, the ALJ issued an opinion that Plaintiff was not disabled because, despite her impairments, she could perform a significant number of limited sedentary-level jobs identified by the vocational expert (R. 170-77). Plaintiff requested review, and on October 10, 2002, the Appeals Council vacated the ALJ's decision and remanded her claim with instructions to seek (a) additional evidence and an evaluation of Plaintiff's treating physician; (b) further evaluation of Plaintiff's mental status pursuant to 20 C.F.R. 404.1520a as of June 30, 1999; and (c) adequate evaluation of Plaintiff's pain and subjective complaint in accordance with 20 C.F.R. 404.1529 (R. 188-90).

A second administrative hearing was held on November 3, 2003, at which Plaintiff again testified and was represented by an attorney (R. 272). Delfin Santo, M.D., Plaintiff's treating physician, also testified. On November 23, 2003, the ALJ issued an opinion that Plaintiff was not disabled because, despite her impairments, she could perform a significant number of limited sedentary-level jobs identified by the vocational expert (R. 21-26). Plaintiff sought review of this decision, but the Appeals Council denied Plaintiff's request for review (R. 8-11).

## B.   Background Facts

### 1.   Plaintiff's Testimony

#### *Disability Application*

Plaintiff was diagnosed with scoliosis when she was 13 years old (R. 71). The problem progressed and started to cause other problems for her, and she had surgery in 1974. After the surgery Plaintiff suffered muscle spasms and pain causing limited ability to sit and stand and frequent need to "use the bathroom" (R. 71-72).

She worked in the past as a cheerleading coach, sketch artist, customer service representative, telemarketer and artist (R. 65).

### *Testimony at First Hearing*

Plaintiff has a high school education (R. 240). Her last employment was as a cheerleading coach. She quit this position in March 1999 because the bus rides and sitting through the games were too painful due to back pain (R. 243). She left her previous position as a sketch artist, a position she held from 1986-1991, due to her back pain (R 64, 244). This position had been given to her by a friend who owned the company (R. 244).

She tried to take care of a three-year-old child in her home for money, but found that the child was too active for her, and she could not keep up with him due to her health problems (R. 244-45). She also took in painting projects for Walnut Ridge Collectibles, but decided to give up this position as well because it entailed driving to Livonia and picking up the items to be painted and Plaintiff could not do the driving (R. 245-46).

She described severe pain occurring when the rod that had been surgically implanted into her spine started to catch on a muscle in her neck in or around 1997 (R. 248). She also has osteoarthritis in her hips, knees and almost every joint, degenerative arthritis in her back and fibromyalgia (R. 249).

She has trouble sleeping and estimated that she gets fours hours of sleep per night, though not in succession (R. 249-50). She is fatigued during the day due to lack of sleep and Behcet's (R. 250). She tries to take a ½ hour nap each afternoon. She has had Behcet's since she was "a little girl," it manifests in mouth ulcers, and it has been getting progressively worse into her adult years (R. 251). Recently her doctor prescribed Prednisone which clears the break-outs up within one

week, but her other doctors have told her she can no longer take Prednisone in this manner due to her other conditions (R. 251-54). They have worked out a compromise which lowered the dose of Prednisone, but this does not completely clear up the mouth ulcers and leaves her subject to repeat infection. When Plaintiff has the mouth ulcers she suffers from inability to eat, fever and anxiety. Plaintiff described her physical and mental state as "out of it" and "real sick" when she has the mouth ulcers and explained that it takes three weeks for the ulcers to heal completely (R. 255). She also has an anxiety disorder and a rapid heart rate brought on by anxiety, but does not see a psychiatrist for this, her rheumatologist is treating her with Buspar which is helping (R 254).

Plaintiff also has difficulty sitting for more than 20 minutes due to the degenerative arthritis in her tailbone (R. 256). She cannot stand for more than 10 minutes. She has trouble lifting any more than a gallon of milk (R. 257). She can walk one full block without stopping, but does not walk because her arms and hands go numb. She is unable to climb stairs, kneel or stoop and can only bend from the waist (R. 258).

Plaintiff does the cooking for her family on a daily basis, and washes the dishes on alternate nights (R. 259). She does the dusting and laundry, though her husband must do any heavy lifting that would be required. Her husband also does all of the vacuuming and floor washing. They grocery shop together and he does all of the lifting required there as well (R. 259-60).

She can dress and bathe herself, and only needs help if she is having a muscle spasm (R. 260). She spends her days crafting, doing needlepoint, sewing, and painting, if she is up to it (R. 260-61). She does have arthritis in her hands but so far she says she is "okay with my hands" (R. 261). During the day she takes a couple of hot showers and uses a heating pad to relieve her pain. She can drive but does so only about once a week to visit her mother (R. 262). She goes out to eat

about once per weekend, cannot sit through a movie in a theater but is able to attend church.

### *Testimony on Remand*

Plaintiff testified that she quit working in March 1999 because of symptoms related to Behcet's and not the scoliosis, i.e. severe canker sores, fatigue and pain (R. 276). She attributes all of the pain in her major joints to the Behcet's. She has the pain all of the time and when she has the flare-ups of the mouth ulcers they last from ten days to six weeks (R. 278). This can cause her to lose weight, as much as 15 pounds (R. 279).

Her doctors have changed her Behcet's treatment from Prednisone to an intravenous immunosuppressant, Remicade. The treatment is given every six weeks and provides relief for only two weeks (R. 280). During the four weeks when the she has the ulcers she has pain all of the time, with ulcers on her gums, tongue and down her throat into her stomach and gastrointestinal tract (R. 281). She is constantly fatigued.

On an average day Plaintiff wakes up and uses a heating pad for two hours before she can get into the shower (R. 283). Then she spends a "lot of my day laying on a couch or in a recliner" due to pain (R. 284).

Plaintiff can walk one half of a block before she must stop due to pain in her back, hip and knee (R. 284-85). Plaintiff stated that she could not stand at all, but then admitted that she could stand for 15-20 minutes without pain and could sit for 20 minutes (R. 285). Plaintiff can lift 5-6 pounds. The rods placed in her back start to "pull" if she tries to lift more than that (R. 286). Plaintiff had arthroscopic knee surgery on her left knee. Her hip "pops out" approximately 5-6 times per month (R. 288).

### 2.    **Husband's Testimony**

Michael McElgunn completed the Social Security *Daily Activities* form in which he described Plaintiff as a positive thinking, well liked, respected individual (R. 82). He described her typical day as one in which she completed light housework such as dusting, dishes and laundry, and traveled short distances to visit relatives (R. 81). He also explained that she frequently engaged in crafting hobbies such as making dough ornaments and painting with watercolor.

Mr. McElgunn did describe Plaintiff's physical state as having "decreased" such that they could no longer go for walks (R. 82), but also indicated that Plaintiff could groom herself, drive (with some limitation) and read and described Plaintiff as "one of the bravest individuals" he knows because she lives with pain everyday and still lives "life the best she can with a positive outlook towards everything" (R. 86). When asked how she responds to pressure situations, Mr. McElgunn responded, "she remains the same" (R. 85).

### 3.   <u>Medical Evidence</u>

#### *<u>Dr. Santo's Hearing Testimony</u>*

Dr. Delfin Santo is Plaintiff's treating physician. He is board certified in internal medicine and rheumatology and has been Plaintiff's physician since 1995 (R. 294). His diagnosis was Behcet's syndrome, scoliosis, flat back syndrome and anxiety.

He testified that Plaintiff had symptoms of Behcet's as far back as 1995, though she was not diagnosed until 2000 (R. 295). Behcet's can cause mouth sores, inflammatory arthritis, severe fatigue and skin rashes. Plaintiff has severe mouth sores and severe fatigue. She may have inflammatory arthritis, but it is uncertain because the steroid treatments she had been given could have masked some symptoms of such. Her fatigue could also have been increased by the medications that she was given to treat the Behcet's (R. 295-96).

6

When asked whether it was reasonable for Plaintiff to be required to lie down for a significant amount of time each day, Dr. Santo answered that it was (R. 296). He explained that Plaintiff had developed a "flat back" due to the Harrington rod placements in her back. These caused "direct pressure on the disks that on a daily basis is going to lead to a significant amount of discomfort and pain, especially if she is not able to lay down" (*id.*). He also described her spine as "one of the worst spines that I treat in my practice" (*id.*).

### *Documentary Evidence Prior to the Expiration of Plaintiff's Insured Status (June 30, 1999)*

On June 7, 1993, Plaintiff was seen as a follow-up to her fusion, which was done when she was 13 years-old (R. 136). She complained of shortness of breath and low back pain. She had a fairly normal range of motion, given her spinal deformity, and negative tension signs and a grossly normal neurological examination in her lower extremities. A June 8, 1993, CT-scan of the lumber spine revealed a mild disc bulge to the left at L4-5 (R. 141).

On June 19, 1993, Plaintiff was seen as a follow-up to her fusion (R. 135). She was diagnosed with degenerative changes below her fusion with back pain particularly in her lumbosacral junction. Her doctor suggested that surgery is sometimes an option for people who develop arthritis below a fusion, but that she did not need surgery immediately. It was suggested that she take Feldene with her evening meal (because she was having a lot of symptoms after work and during sleep), try physical therapy and use back support.

On July 13, 1993, Plaintiff was sent to physical therapy with complaints of low back pain by Dale Hoekstra, M.D. (R. 129). The physical therapist reported a reduction in Plaintiff's pain after a two-week course of treatment and noted that Plaintiff was advised to remain "lightly active" (*id.*).

On February 26, 1996, Plaintiff complained that her back rod was "prominent" and was

7

creating a snapping sensation (R. 135). X-rays confirmed that the rod was prominent but not loose, and the doctor suggested that she try to live with the situation if possible.

August 22, 1998, cervical spine X-rays ordered by Dr. Santos indicated a mild foraminal encroachment of C5-6 on the left (R 153).

On January 18, 1999, Plaintiff saw her orthopedist with complaints of a sore spot on her back in the middle of the spinal fusion that was done 25 years ago (R. 134). X-rays of her spine revealed no obvious abnormality, and she was prescribed Relafen and told to return in one week (*id.,* R. 138,151). She returned on February 8, 1999, and indicated that she was feeling significantly better. Her Relafen was reduced and she was told to return again in another week.

On March 25, 1999, Plaintiff complained that her left parascapular region had been bothering her for six weeks and noted that the Relafen was upsetting her stomach (R. 133). The treating physician diagnosed myofascial back pain and prescribed Celebrex and asked Plaintiff to return in one month.

### ***Documentary Evidence After Expiration of Plaintiff's Insured Status (June 30, 1999).***

A May 1, 2000, bone density study was consistent with osteopenia in the hip and femoral neck region, and also produced a femoral neck measurement near the borderline for mild osteoporosis (R. 147-150).

On June 16, 2000, and July 14, 2000, Plaintiff was seen for upper extremity numbness (R. 133). It was noted that she was also being treated for thyroid disease, fibromyalgia and scoliosis. An MRI of her cervical spine was labeled unremarkable[1] and it was determined that the numbness

---

[1]The MRI report indicates: "(1.) Endplate spondylosis with left foraminal spur narrowing the left foramen. Although seen on August 1998 outside radiographs, the stenosis appears to

8

was likely caused by subtle peripheral neuropathy or the fibromyalgia (R. 133).

On January 3, 2001, Dr. Santos wrote a letter to the State of Michigan Disability Determination Service (R. 145-46). In this letter he indicated that he had been treating Plaintiff since 1995 and that she suffered from various maladies including scoliosis, Hoffa's disease, chronic active stomatitis, anxiety disorder, fibromyalgia and polyarticular degenerative arthritis in her back and left knee (R. 145). Dr. Santos described Plaintiff as totally disabled due to severe kyphoscoliosis, chronic pain, fibromyalgia and degenerative arthritis (R. 146).

On January 23, 2001, Dr. Hoekstra completed a Family Independence Agency report and diagnosed Plaintiff with "idiopothic scolisis curvature of spine with tenderness with discomfort in the middle of fusion" (R. 130). Her entire spine and lower extremities were involved which decreased her range of motion, requiring analgesics daily for functioning. She also had subtle peripheral neuropathy. Her gait was described as guarded (R. 131).

On March 26, 2001, Plaintiff saw Dr. Hoekstra complaining of lumbosacral pain on her left side (R. 165). Dr. Hoekstra recommended that she continue with the medicine Dr. Santo had prescribed, follow up with Dr. Hoekstra as needed, and predicted that her fusion would need to be extended at a later date. He also noted that her medical history was "pretty much unchanged from previous evaluations" and that Plaintiff was applying for DIB.

In July 2001, Dr. Santos wrote a letter reporting that Plaintiff experienced stomatitis, and had "recently" been diagnosed with Behcet's syndrome (R. 142-44).

---

have progressed. Correlation with recent cervical spine studies recommended. No superimposed soft disc herniation, although the annulus does bulge slightly. (2.) Focal bulge, right paracentral C3-4, but not confirmed on the transverse images. No frank extruded disc material otherwise noted" (R. 137).

On August 17, 2001, Plaintiff complained to Dr. Hoekstra of numbness in her right foot that had lasted 3 weeks (R. 165).  He determined that the numbness was likely unrelated to her scoliosis and suggested that she have an EMG with Dr. Santos if the symptoms persisted for another 3 weeks (R. 166).

Dr. Santos completed a *Physical Residual Functional Capacity Questionnaire* that is undated, although a handwritten indication notes that it was "mailed 9-10-2001" (R. 154).[2]  Dr. Santos explained that Plaintiff's Behcet's syndrome, severe stomatitis, osteoarthritis and scoliosis cause her constant pain at a level sufficient to interfere with attention and concentration (R. 154-55).  He believed that she is incapable of even low stress jobs (R. 155).

In October, 2001, Plaintiff visited a dermatology clinic on two occasions, having been referred by Dr. Santos (R. 159-62).  A biopsy was taken to determine the cause of her mouth ulcers, which she reported having had for "4 decades" (R. 161).  The results of the biopsy were negative, which  indicated that autoimmune blistering diseases[3] were "less likely" (R. 160).

On May 2, 2002, David P. Fivenson, M.D. wrote a letter in support of Plaintiff's disability application (R 209-10).  Dr. Fivenson explained that he had diagnosed Plaintiff with Behcet's and felt that she had been totally disabled from work for over two years and would continue to be so into the foreseeable future (R. 209).

On September 7, 2002, Plaintiff again visited the dermatology clinic and reported that the oral ulcerations had been a lifelong problem (R. 202).  She was started on Remicade and asked to

---

[2]ALJ Varga questioned Dr. Santos to determine whether he could recall when this was completed , but he could not recall the date specifically (R. 302-303).

[3]Behcet's is an autoimmune disease (R. 144, 165).

return in four weeks.

### 4.   Vocational Evidence

ALJ Varga asked Asa Brown, the vocational expert (VE) at Plaintiff's administrative

hearing,

whether jobs existed that Plaintiff could perform if her testimony and the testimony of her doctor

were taken as true regarding her ability during the period between March 28, 1999, and June 30,

1999 (R. 306-307).  And, in response to this hypothetical VE Brown explained:

> Behcet's symptoms.... This would include chronic back, hand, hip, knee pain, along
> with chronic and extreme fatigue and weakness, coupled with ulcers in her digestive
> tract and all the way through to her intestine, including flare-ups that would last from
> anytime from ten days to two weeks accompanied by weight loss and indicates that
> she must lie down multiple times during the day for symptom relief.  Those factors,
> its certainly an aggregate that would preclude competitive employment for anybody.

(R. 307).

ALJ Varga then posed the following hypothetical: a person of Plaintiff's age, sex,

educational level and work experience, during the same time period, that is capable of sedentary

work with a sit/stand option (R. 307), that is performed indoors, with no lifting over ten pounds, no

climbing stairs, no bending, no exposure to heights, no driving, no climbing, no work around

dangerous machinery, and involves only simple and routine tasks, very few steps in the completion

of assigned tasks, low stress work environment, and limited contact with the public, co-workers, and

supervisors (R. 308).

VE Brown responded that in mid-1999 there were 9,500 unskilled, entry-level jobs in the

region that such an individual could perform that would have required one week of vocational

adjustment (R. 310).

### 5.   ALJ Varga's Decision

11

ALJ Varga found that Plaintiff met the disability insured status requirements on her alleged onset date, March 28, 1999, through June 30, 1999, and that she had not engaged in substantial gainful activity since March 28, 1999 (R. 24).

In the period through June 30, 1999, Plaintiff had Behcet's syndrome, scoliosis, flat back syndrome, anxiety, fibromyalgia, chronic low back pain and degenerative arthritis in the left knee and back (R. 25).   The severity of the Plaintiff's conditions considered individually or in combination did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (the "Listing").

Plaintiff's testimony regarding the extent of her limitations from March 28, 1999, through June 30 , 1999, was not substantiated by the objective medical evidence.

Plaintiff was unable to perform her past work, had no transferrable skills and had a high school education.

During the period through June 30, 1999, she had the residual functional capacity (RFC) for sedentary work with a sit/stand option, an indoor work environment, no stairs, no bending, no work around unprotected heights, no driving, no climbing, no work around hazardous machinery, only simple and routine tasks, low stress work environment and limited contact with the public, co-workers and supervisors .

Using the Medical-Vocational Guidelines as a framework, together with the testimony of the VE Brown, ALJ Varga determined that Plaintiff could perform a significant number of jobs in the economy, referring to the limited number of sedentary jobs identified by the VE.  Plaintiff was, therefore, found to be not disabled.

## II.   ANALYSIS

### A.   Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.   Factual Analysis

Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

medical evidence, including the claimant's subjective accounts of symptoms, in determining residual functional capacity (RFC). Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, (*Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social §*, 336 F.3d 469, 476 (6th Cir. 2003)), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain. *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986). While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence. Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain. Section 404.1529(c)(2),[5] *see also Duncan,* 801 F.2d at 853; *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,*

---

[5] 29 C.F.R. § 404.1529(c)(2) states:
> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

14

947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985);

*Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

     *Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994), made it clear that "[t]here is no practical

difference between requiring a claimant to prove pain through objective evidence and rejecting her

subjective evidence because it is not corroborated by objective evidence."  Nor can an ALJ merely

recount the medical evidence and claimant's daily activities and then without analysis summarily

conclude:

> Based upon an overall evaluation of the relevant written evidence of
> record as summarized above, the undersigned finds it does not contain
> the requisite clinical, diagnostic or laboratory findings to substantiate
> or form the underlying basis for claimant's testimony regarding totally
> disabling pain and other disabling impairments. . . .

*Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994).[6]

     *Jones v. Commissioner,* 336 F.3d 469, 476 (6th Cir. 2003), notes that an ALJ can reject a

claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question

to the VE, if the ALJ's reasons are adequately explained.

     If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a

detailed statement explaining the ALJ's reasons.  SSR 96-7p directs that with respect to findings on

credibility they cannot be general and conclusory findings but rather must be specific.  The ALJ must

say more than that the testimony on pain is not credible.  *Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th

---

[6]  In the present case ALJ Varga declared not that Plaintiff lacked the objective support for her pain complaints, but that she lacked evidence that she had visited a doctor during the 3 month period between when she quit work and when her insured status expired - summarily concluding that only a doctor's visit can form the underlying basis for a claimant's testimony regarding totally disabling pain.

Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id.* at 1039. "The SSA regulations clearly state that this is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2)." *Id.* The ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. *Id.* at 1039-1040.

Plaintiff indicated in her disability application that her daily activities were limited and that she sometimes was unable to do anything because of her pain (R. 91-96 ). She and her husband both provided information that she frequently breaks out with "canker sores" in her mouth which cause to be unable to eat to the point that she loses weight (R. 91-92, 81-86), which was confirmed by her treating dermatologist (R. 209). Further information provided by her husband indicated that "her physical aspects have decreased" and that she was able to complete only light housework, no yard work, needed assistance with grocery shopping and could not stand too long during cooking. Plaintiff also indicated that her medical conditions and the medication she takes caused her pain and fatigue which required her to lay down frequently during the day (R. 95, 284) and this was corroborated by her treating physician (R. 302). Plaintiff was taking Prednisone which may have contributed to her osteoporosis (R. 282), and is now taking an immunosuppressant drug which Plaintiff testified requires her to remain out of contact with persons who are sick (R. 280). Plaintiff also testified that she spent two hours each morning on a heating pad before she was able to get into a shower, and that her constant fatigue made even taking a shower an effort for her (R. 283). These factors should have been

16

considered in the context of determining whether Plaintiff's subjective pain complaints were credible.

Plaintiff had the burden of providing objective evidence confirming the severity of the alleged pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain. *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *See also McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

Here, Plaintiff has substantial objective and clinical diagnostic evidence of an underlying scoliosis and Behcet's disease confirming her diagnosis of a severe "underlying medical condition." As in most cases, there is no objective evidence of the pain itself for the relevant time period. Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." Her subjective evidence and extensive and relatively consistent treatment history is central to this analysis. Yet, the evidence is not unequivocal.

The validity of ALJ Varga's opinion largely hinges upon the weight given to Plaintiff's treating physician, Dr. Santos. Dr. Santos declared Plaintiff disabled during her insured status period (R. 146, 211, 297) and agreed with her testimony that she needed to spend portions of each day lying

down to alleviate her pain symptoms (R. 296).[7]  The only "evidence" ALJ Varga cited to refute Dr.

Santo's opinion was the fact that Plaintiff was not treated by a doctor during the period from when

she quit working, March 28, 1999, to when her insured status expired, June 30, 1999 (R. 23).

The case law in this Circuit has stated that if adequately supported by objective findings, and

if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of

disability was binding on the Social Security Administration as a matter of law.[8]  The administrative

decision could reject a properly supported treating physician's opinion of disability if the record

contains "substantial evidence to the contrary."  *Hardaway v. Secretary of HHS*, 823 F.2d 922, 927

(6th Cir. 1987).  Yet, this law has been slightly modified by administrative regulation to give the

Commissioner broader discretion to reject certain treating physician options.

In August 1991, the Social Security Administration adopted a new regulation in response to

the treating physician rules adopted by the various circuits.  20 C.F.R. §404.1527 [SSI § 416.927].

While the regulation indicates that the Commissioner will generally give more weight to the opinions

of treating sources, it sets preconditions for doing so, which are more strict than those established by

the Sixth Circuit.  The 1991 regulation also limits the scope of the subject matters on which the

Commissioner will give a treating source opinion greater weight.

Under the new regulation, the Commissioner will only be bound by a treating source opinion

---

[7]Dr. Fivenson (R. 209) and Dr. Hoekstra (R. 199) also wrote letters to support Plaintiff's
disability claim.

[8] *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and
diagnoses of treating physicians are generally accorded substantial deference, and if the opinions
are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)
(same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v.
Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

18

when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI § 916.927(d)]. *See also* S.S.R. 96-2p. In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record.[9]

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion on "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 1527(d)(2), [SSI § 916.927(d)(2)]. Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the Commissioner will not defer to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work.

Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

In 20 C.F.R. 404.1513(b) &(c) [SSI § 416.913 (b) &(c)] and SSR 96-5p the Commissioner distinguishes between a treating source "statement about what [a claimant] can still do despite . . .

---

[9] Those five criteria are:

 (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;

 (2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;

 (3) the consistency of the opinion with the record as a whole;

 (4) specialty, with greater weight given to relevant specialists;

 (5) and other factors which tend to support or contradict the opinion.

impairment(s)" and the formal administrative finding on "residual functional capacity." The former is a physician's opinion on either physical or psychological capacities for work related activities. The former, when based on the medical source's records, clinical and laboratory findings, and examinations can be considered a "medical opinion" under § 404.1527(a)(2) [SSI § 416.913(a)(2)] because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion." Yet, because these medical opinions are different from the formal findings under § 404.1527(e) [SSI § 416.913(e)] on "disability" and on "residual functional capacity" -- which are subjects reserved to the Commissioner and which may be based on additional evidence in the record -- the Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §1527(d)(2) [§ 416.927(d)(2)], *i.e.* the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."

Therefore, ALJ Varga need not have deferred to Dr. Santos' determination that Plaintiff was disabled, but he was required to defer to Dr. Santos' medical opinion about what she can still do despite her impairments unless such was contradicted by substantial evidence in the record. His explanation at the hearing that the Harrington rod in her back would cause pressure on the discs and pain, especially if she was unable to lie down, and his separate confirmation of her need to lie down for significant periods each day are medical opinions under the Commission's regulations.

ALJ Varga decided that Dr. Santos' medical opinion was contradicted by substantial evidence in the record because "there is no substantial evidence indicating treatment from March 28, 1999

through June 30, 1999" (R. 23).  This is quite different from finding that there is evidence in the record to refute Dr. Santos' opinion.  The fact that Plaintiff may have elected not to visit a doctor's office during this time is not dispositive of her claim.  Plaintiff testified that she had been using a heating pad, hot showers, pain medication, and steroid treatments to treat her pain.  In fact, she had been prescribed a new pain medication on March 25, 1999, and quit working as a cheerleading coach on March 28, 1999, a job she explained had been aggravating her condition.  Also, her no longer working would accommodate her need to lie down periodically during the dy to relive her symptoms.  These facts may have contributed to her not being required to visit a doctor again during the 3 month period before her insured status expired.  Therefore her lack of a doctor's visit does not dictate a finding contrary to Dr. Santos' opinion that Plaintiff has a condition which requires her to lie down periodically to alleviate her pain symptoms, because there was substantial evidence in the record to support his opinion.

Thus the second hypothetical question posed to VE Brown was incomplete because it failed to describe Plaintiff in all significant, relevant respects due to the fact that it did not take into account Plaintiff's undisputed need to lie down periodically.  ALJ Varga relied on VE Brown's response to this hypothetical in determining that there were a substantial number of jobs available in 1999 that Plaintiff could have performed.  Yet, as stated above, a response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform. *Varley*, 820 F.2d at 779.

Therefore, on the present record, with the inadequate credibility finding and reliance on an incomplete hypothetical, there is not substantial evidence to uphold the Commissioner's finding and the decision of the Commissioner cannot be upheld.  The remaining question is whether to remand

for further proceedings or for an award of benefits. *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

In the present matter proof of Plaintiff's disability is strong. Further, the first hypothetical question ALJ Varga presented to VE Brown assumed a person of Plaintiff's age, sex, educational level and work experience that had all of the health problems and limitations that Plaintiff and her treating physician alleged (R. 306-07). And, in response to this hypothetical VE Brown explained that "those factors ...would preclude competitive employment for anybody" (R. 307). VE Brown specifically noted as a vocationally limiting factor the need to "lie down multiple time during the day for symptom relief" (*id.*).

Therefore, this matter should be remanded for an award of benefits.

## III.   RECOMMENDATION

For the reasons stated above, It is Recommended that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*,

932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: October 31, 2005       s/Steven D. Pepe     
Ann Arbor, Michigan        United States Magistrate Judge

<u>Certificate of Service</u>

I hereby certify that copies of the above were served upon the attorneys of record by electronic means or U. S. Mail on October 31, 2005.

s/William J. Barkholz  
Courtroom Deputy Clerk